ROBBINS UMEDA LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsumeda.com
FELIPE J. ARROYO (163803)
farroyo@robbinsumeda.com
SHANE P. SANDERS (237146)
ssanders@robbinsumeda.com
KEVIN S. KIM (275200)
kkim@robbinsumeda.com
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

[Additional Counsel on Signature Page]

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN JOSE DIVISION THE CITY OF BIRMINGHAM RETIREMENT AND RELIEF SYSTEM, Derivatively and on Behalf of HEWLETT PACKARD COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> LEO APOTHEKER, MICHAEL LYNCH, CATHERINE A. LESJACK, JAMES MURRIN, SHANE ROBISON, MARC ANDREESEN, SHUMEET BANDERJI, RAJIV GUPTA, JOHN HAMMERGREN, RAYMOND LANE, ANN LIVERMORE, GARY REINER PATRICIA RUSSO, G. KENNEDY THOMSPSON, MARGARET WHITMAN, RALPH WHITWORTH, SARI BALDAUF, DOMINIQUE SENEQUIER, LAWRENCE BABBIO, JR., DELOITTE LLP, PERELLA WEINBERG PARTNERS UK LLP, and BARCLAYS CAPITAL, <br><br> Defendants, <br><br> and <br><br> HEWLETT-PACKARD COMPANY, <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

### OVERVIEW OF THE ACTION

1.     Plaintiff the City of Birmingham Retirement and Relief System ("Plaintiff" or "Birmingham") brings this shareholder derivative lawsuit on behalf of nominal defendant Hewlett-Packard Company ("HP" or the "Company") against certain current and former officers and directors of the Company, along with Deloitte LLP ("Deloitte"), Perella Weinberg Partners UK LLP ("Perella Weinberg") and Barclays Capital Securities Ltd. ("Barclays"), for breaching their fiduciary duties, and aiding and abetting such breaches, during the period August 19, 2011 to the present (the "Relevant Period").

2.     HP is a leading global technology company, providing products, technologies, software, and services to individual consumers and small- and medium-sized businesses, as well as to the government, health, and education sectors worldwide.

3.     In October 2011, HP completed the acquisition of British software company Autonomy Corporation plc ("Autonomy"), a company specializing in intelligent search and data analysis, for $11.1 billion, or approximately $42.11 per share (the "Acquisition"). HP's CEO at the time, defendant Leo Apotheker, touted the Acquisition by stating: "Together we plan to reinvent how both structured and unstructured data is processed, analyzed, optimized, automated and protected."

4.     On November 20, 2012, HP revealed that it had found serious wrongdoing in its acquisition of Autonomy, resulting in a massive charge due to the "serious improprieties." The Company was forced to write-down goodwill by $8.8 billion, in effect admitting that Autonomy was worth 79% less than HP had paid for it. The HP Individual Defendants (as defined below) attempted to shift the blame for the disastrous Acquisition on Autonomy's former CEO, defendant Michael Lynch, along with Deloitte, Perella, and Barclays, stating in the November 20, 2012 press release that the "majority of this impairment charge is linked to serious accounting improprieties, disclosure failures, and outright misrepresentations at Autonomy . . . "

5.     Just over a year after the announcement of the Acquisition, *The New York Times* called the Acquisition the "worst corporate deal ever," comparing it unfavorably to the AOL-

1  Time Warner deal.[1]  The disastrous acquisition has caused enormous damage to the Company as

2  over $30 billion of HP's market capitalization has been eviscerated since the Autonomy

3  acquisition was announced:



6.      In the wake of the scandal, the HP Individual Defendants sought to shift the

blame to the auditors and to the management of Autonomy.  However, the law does not allow the

HP Individual Defendants to shift their fiduciary duties to outside parties.  Boards of Directors

must actively review all reasonably available information in performing their duties, and the HP

Individual Defendants miserably failed in their duties.  Because of their failure to abide by their

fiduciary duties, HP has suffered enormous damages in connection with the Acquisition.  The HP

Individual Defendants consciously disregarded a number of warning signs which should have

---

[1] *See* "From H.P., a Blunder That Seems to Beat All," by James B. Stewart, *The New York Times*, November 30, 2012.

alerted them to Autonomy's accounting improprieties and the resulting overvaluation of Autonomy. A small sampling of these warning signs, discussed more fully below, range from: HP's long history of overpaying for acquisitions; the excessive purchase price of Autonomy in light of the lower valuations of similar companies and comparable transactions; public criticism of Autonomy by a number of industry experts; Autonomy's publicly available financial statements, which should have indicated that the Acquisition was a bad deal; and whistle-blowers' reports regarding Autonomy's accounting improprieties.

7. Also during this time, the Board permitted HP to repurchase artificially inflated HP stock, at prices twice as high as their true worth (based on the fall of HP share prices after Autonomy's accounting improprieties were revealed). The Board allowed HP to repurchase over 83 million shares of its own stock at these artificially inflated prices, despite being aware that forthcoming announcements related to Autonomy's damaged intangible assets and goodwill would cause the Company's stock to fall steeply.

8. The HP Individual Defendants misled the public through their improper statements related to the Acquisition, including statements related to Autonomy's acquired intangible assets and goodwill; the due diligence performed on Autonomy; and the value and benefits that the Acquisition would provide to HP. As a result of the disastrous Autonomy Acquisition, HP's value has declined to under $30 billion, from over $61 billion prior to the announcement of the Acquisition, wiping out over 50% of the Company's value. Additionally, HP is now the defendant in a federal securities class action in the Northern District of California on behalf of shareholders who purchased HP shares and suffered damages related to the Acquisition. That lawsuit subjects the Company to millions, if not billions, in additional damages.

9. Plaintiff brings this action on behalf of the Company to, among other things, recover damages caused by the defendants' unlawful courses of conduct, breaches of fiduciary duty, deceptive business practices, recklessly deficient due diligence, highly deficient auditing practices, and violations of federal law.

1

## JURISDICTION AND VENUE

2   10. This Court has jurisdiction over this action pursuant to Article III of the United

3 States Constitution and 28 U.S.C. § 1331 in that the Complaint includes claims arising under the

4 Exchange Act.  The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over all

5 other claims that are so related to claims in the action within such original jurisdiction that they

6 form part of the same case or controversy under Article III of the United States Constitution.

7 This action is not a collusive one to confer jurisdiction on a court of the United States which it

8 would not otherwise have. Jurisdiction is also conferred by 28 U.S.C. §1332.  Complete diversity

9 among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests

10 and costs.

11   11. This Court has jurisdiction over each defendant named herein because each

12 defendant is either a corporation that conducts business in and maintains operations in this

13 district, or is an individual who has sufficient minimum contacts with this District to render the

14 exercise of jurisdiction by the District courts permissible under traditional notions of fair play

15 and justice.

16   12. Venue is proper in this district in accordance with 28 U.S.C. § 1391(a) because:

17 (i) HP maintains its principal place of business in this District; (ii) one or more of the defendants

18 either resides in or maintains executive offices in this District; (iii) a substantial portion of the

19 transactions and wrongs complained of herein, including the defendants' primary participation in

20 the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of

21 fiduciary duties owed to HP, occurred in this district; and (iv) defendants have received

22 substantial compensation in this District by doing business here and engaging in numerous

23 activities that had an effect in this district.

24

## INTRADISTRICT ASSIGNMENT

25   13. A substantial portion of the transactions and wrongdoing which give rise to the

26 claims in this action occurred in the County of San Jose, and as such, this action is properly

27 assigned to the San Jose division of this Court.

28

**PARTIES**

14.     Plaintiff Birmingham is a public pension fund located in Birmingham, Alabama which provides pension benefits for retired city employees.  Birmingham is a shareholder of HP and has continuously been a shareholder of HP since 2003.   Plaintiff is a citizen of Alabama.

15.     Nominal Defendant HP is a Delaware corporation and is headquartered at 3000 Hanover Street, Palo Alto, California.  Thus, HP is a citizen of both Delaware and California. HP trades on the NYSE under the symbol "HPQ."   During the Relevant Period, HP had approximately 1.9 billion shares outstanding.

16.     Defendant Leo Apotheker ("Apotheker") was the former CEO and director of HP, and was involved in the Autonomy acquisition.  Apotheker served as CEO and president of HP from November 1, 2010 until September 22, 2011.  Apotheker received over $30 million in compensation from HP, including severance of $7.2 million and a performance bonus of $2.4 million, despite serving for less than eleven months and despite the Company and its shareholders losing more than $30 billion during this time.  Defendant Apotheker is a citizen of California.

17.     Defendant Michael Lynch ("Lynch") is the founder of Autonomy and was its CEO from 1996 until the time of the Acquisition.  After selling Autonomy to HP, Lynch served as HP's Executive Vice President, Information Management from November 2011 until May 2012.   As CEO of Autonomy at the time of the Acquisition, Lynch was responsible for Autonomy's operations, financial statements, and internal controls.   Lynch took the lead in directing the sale of Autonomy to HP and in inducing HP to materially overpay for Autonomy at a time when it was overvalued due to accounting improprieties.  Lynch eventually left HP in May 2012 based on the problems with Autonomy, but HP concealed the extent and magnitude of these problems from the investing public for approximately six months.  Defendant Lynch is a citizen of the United Kingdom.

18.     Defendant Catherine A. Lesjak ("Lesjak") has served as executive vice president and chief financial officer of HP since January 1, 2007 and was involved in the Autonomy

1   acquisition.  Lesjak also served as interim CEO of HP from August 2010 through October 2010.

2   Defendant Lesjak is a citizen of California.

3        19.      Defendant James T. Murrin ("Murrin") was HP's Senior Vice President, Chief

4   Accounting Officer and Controller during the Relevant Period.  Murrin sold 132,500 shares of

5   his HP stock for proceeds of nearly $3.5 million while in possession of materially adverse and

6   non-public information during the Relevant Period.  Defendant Murrin is a citizen of California.

7        20.      Defendant Shane Robison ("Robison") is a former executive officer of HP who

8   was involved in the Autonomy Acquisition.  Robison served as HP's Executive Vice President

9   and Chief Strategy and Technology Officer from May 2002 to November 2011.  Robison was

10  blamed as a key culprit in the wrongdoing by Defendant Whitman.  HP awarded Robison total

11  compensation of over $9 million in 2011.  Defendant Robison is a citizen of California.

12       21.      Defendant Marc L. Andreesen ("Andreesen") is a current director of HP and has

13  served on the Board since 2009.  Defendant Andreesen is a citizen of California.

14       22.      Defendant Shumeet Banerji ("Banerji") is a current director of HP and has served

15  on the Board since January 2011.  Defendant Banerji is a citizen of the United Kingdom.

16       23.      Defendant Rajiv L. Gupta ("Gupta") is a current director of HP and has served on

17  the Board since November 2011.  Defendant Gupta is a citizen of Pennsylvania.

18       24.      Defendant John H. Hammergren ("Hammergren") is a current director of HP and

19  has served on the Board since 2005.  Defendant Hammergren is a citizen of California.

20       25.      Defendant Raymond J. Lane ("Lane) is a current director of HP and has served on

21  the Board since September 2011.  Defendant Lane is a citizen of California.

22       26.      Defendant Ann M. Livermore ("Livermore") is a current director of HP and has

23  served on the Board since June 2011.  Defendant Livermore is a citizen of California.

24       27.      Defendant Gary M. Reiner ("Reiner") is a current director of HP and has served

25  on the Board since January 2011.  Defendant Reiner is a citizen of Connecticut.

26       28.      Defendant Patricia F. Russo ("Russo") is a current director of HP and has served

27  on the Board since January 2011.  Defendant Russo is a citizen of Florida.

28

29.     Defendant G. Kennedy Thompson ("Thompson") is a current director of HP and has served on the Board since 2006. Defendant Thompson is a citizen of North Carolina.

30.     Defendant Margaret C. Whitman ("Whitman") is a current director and the CEO and President of HP. In 2011, Whitman received total compensation from HP of $16.5 million. Defendant Whitman is a citizen of California.

31.     Defendant Ralph Whitworth ("Whitworth") is a current director of HP and has been since November 2011. Defendant Whitworth is a citizen of California.

32.     Defendant Sari M. Baldauf ("Baldauf") was a director of HP from 2006 to March 2012. Baldauf was a member of the Audit Committee from January 2010 through February 2012. Defendant Baldauf is a citizen of Finland.

33.     Defendant Dominique Senequier ("Senequier") was a director of HP from January 2011 to March 2012. Senequier was a member of the Audit Committee from February 2011 to December 2011 and was a member the Finance and Investment Committee from February 2011 to September 2011. Defendant Senequier is a citizen of France.

34.     Defendant Lawrence T. Babbio, Jr. ("Babbio") was a director of HP from 2002 to March 2012. Babbio was member of the Finance and Investment Committee from February 2011 to September 2011. Defendant Babbio is a citizen of New York.

35.     Defendant Deloitte LLP ("Deloitte") is a United Kingdom limited liability partnership and the United Kingdom member firm of Deloitte Touche Tohmatsu Limited. Deloitte served as Autonomy's independent auditor during HP's acquisition of Autonomy. Deloitte's principal executive offices are located at 2 New Street Square, London EC4A 3BZ, United Kingdom. Thus, defendant Deloitte is a citizen of the United Kingdom.

36.     Defendant Perella Weinberg ("Perella") is a United Kingdom limited liability partnership which served as joint financial advisor to HP in connection with the acquisition of Autonomy. Perella's principal executive offices are located at 20 Grafton Street, London, W1S 4DZ, United Kingdom. Thus, defendant Perella is a citizen of the United Kingdom.

37.     Defendant Barclays Capital ("Barclays") is the investment banking division of Barclays Bank plc and served as joint financial adviser and corporate broker to HP in connection with the acquisition of Autonomy.  Barclays' principal executive offices are located at 5 The North Colonnade, Canary Wharf, London E14 4BB, United Kingdom.  Thus, defendant Barclays is a citizen of the United Kingdom.

38.     Defendants Lynch, Apotheker, Whitman, Lesjak, Murrin and Robison are sometimes referred to herein as the "Officer Defendants."

39.     Defendants Apotheker, Whitman, Thompson, Gupta, Banerji, Reiner, Hammergren, Andreesen, Lane, Russo, Livermore, Whitworth, Babbio, Baldauf, and Senequier are sometimes referred to herein as the "Director Defendants."

40.     Defendants Thompson, Gupta, Banerji, Reiner, Babbio, Baldauf, and Senequier are sometimes referred to herein as the "Audit Committee Defendants."

41.     Defendants Thompson, Banerji, Reiner, Hammergren, Livermore, Whitworth, Babbio and Senequier are sometimes referred to herein as the "Finance and Investment Committee Defendants."

42.     Defendants Apotheker, Whitman, Lesjak, Murrin, Thompson, Gupta, Banerji, Reiner, Hammergren, Andreesen, Lane, Russo, Livermore, Whitworth, Robison, Babbio, Baldauf, and Senequier are sometimes referred to herein as the "HP Individual Defendants."

43.     Defendants Perella and Barclays are sometimes referred to herein as the "Advisor Defendants."

## DUTIES OF THE HP INDIVIDUAL DEFENDANTS

### Fiduciary Duties

44.     By reason of their positions as officers, directors, and/or fiduciaries of the Company, their access to Autonomy, and because of their ability to control the corporate affairs and business of the Company and its subsidiaries, the HP Individual Defendants owed the Company and its shareholders fiduciary obligations of good faith, trust, loyalty, due care, and candor, and were and are required to use their best efforts to control and manage the Company

and its subsidiaries in a fair, just, honest, and equitable manner. The HP Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and its subsidiaries and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

**The Audit Committee Defendants**

45.    In addition to the duties listed above, the Company's Audit Committee Charter provided the following:

> The Audit Committee assists the Board in fulfilling its responsibilities for generally overseeing HP's financial reporting processes and the audit of HP's financial statements, including the integrity of HP's financial statements, HP's compliance with legal and regulatory requirements, the qualifications and independence of the independent registered public accounting firm, the performance of HP's internal audit function and the independent registered public accounting firm, and risk assessment and risk management. Among other things, the Audit Committee prepares the Audit Committee report for inclusion in the annual proxy statement; annually reviews its charter and performance; appoints, evaluates and determines the compensation of the independent registered public accounting firm; reviews and approves the scope of the annual audit, the audit fee and the financial statements; reviews HP's disclosure controls and procedures, internal controls, information security policies, internal audit function, and corporate policies with respect to financial information and earnings guidance; reviews regulatory and accounting initiatives and off-balance sheet structures; oversees HP's compliance programs with respect to legal and regulatory requirements; oversees investigations into complaints concerning financial matters; and reviews other risks that may have a significant impact on HP's financial statements. The Audit Committee works closely with management as well as the independent registered public accounting firm.

46.    The Audit Committee Charter indicated that the Audit Committee was required to: (1) review and discuss with management and the independent auditor the Company's annual audited financial statements and any certification, report, opinion or review rendered by the independent auditor, and recommend to the Board whether the audited financial statements should be included in the Company's annual report on Form 10-K; (2) review and discuss with

management and the independent auditor the Company's quarterly financial statements; (3) review and discuss with management and the independent auditor the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" appearing in the Company's periodic reports; (4) review and discuss with management all press releases regarding the Company's financial results, pro-forma earnings, and any other information provided to securities analysts and rating agencies, including any non-GAAP financial information; (5) periodically meet separately with management and with the independent auditor; and (6) review and discuss with management and the independent auditor any off-balance sheet transactions or structures and their effect on the Company's financial results and operations, as well as the disclosures regarding such transactions and structures and their effect on the Company's financial results and operations.

**Finance and Investment Committee Duties**

47.    In addition to the duties listed above, the Company's Finance and Investment Committee Charter provided that one of the most important duties of that Committee is to "assist the Board in evaluating investment, acquisition, enterprise services, joint venture and divestiture transactions in which HP engages as part of its business strategy from time to time."

48.    In other words, it was peculiarly the job of the Finance and Investment Committee Defendants to assist the Board in evaluating the acquisition of Autonomy.  Additionally, the Committee had the full authority, pursuant to Section III.5 of its Charter, to retain its own advisors, at HP's expense, if they felt doing so was necessary to fulfill their duties as Finance and Investment Committee members.

49.    The Committee was also responsible for reviewing completed transactions:

Evaluation of Completed Transactions. The Committee will evaluate the execution, financial results and integration of HP's completed investment, acquisition, enterprise services, joint venture and divestiture transactions.

50.    Despite these heightened duties, the Finance and Investment Committee Defendants ignored obvious warning signs (discussed herein) related to questionable accounting

at Autonomy and failed to conduct adequate due diligence before approving the acquisition of Autonomy.

**Control, Access, and Authority**

51.     The HP Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

52.     Because of their advisory, executive, managerial, and directorial positions with HP, each of the HP Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of HP and about the true value of Autonomy.

53.     At all times relevant hereto, each HP Individual Defendant was the agent of each of the other HP Individual Defendants and of HP, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

54.     To discharge their duties, the Individual Defendants, as officers and/or directors of the Company, were required to exercise prudent and reasonable supervision over the management, policies, practices and controls of the Company and its subsidiaries.  By virtue of such duties, the Individual Defendants were required to, among other things:

    a.  exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

    b.  exercise good faith in ensuring that the Company and its subsidiaries were operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements and the Company's governing documents, including acting only within the scope of their legal authority;

    c.   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making full, fair, and accurate disclosures to shareholders about the Company's financial results;

    d.   conduct a thorough due diligence investigation before agreeing to acquire a company; and

    e.   remain informed as to how HP conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

55.    The conduct of the HP Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of HP, the absence of good faith on their part, and a reckless disregard for their duties to HP and its shareholder that the HP Individual Defendants were aware or should have been aware posed a risk of serious injury to HP.   The conduct of the HP Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining HP Individual Defendants who collectively comprised all of HP's Board.

56.    The HP Individual Defendants each breached their duty of loyalty and good faith by allowing the other HP Individual Defendants to cause, or by themselves causing the Company to misrepresent the Company's financial results and prospects, and by failing to prevent employees and/or officers of the Company from taking such illegal actions.

**Conspiracy, Aiding and Abetting, and Concerted Action**

57.    In committing the wrongful acts alleged herein, the defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their liability.   The defendants further aided and abetted and/or assisted each other in breaching their respective duties.

58.     During all relevant times, the defendants collectively and individually initiated a course of conduct that was designed to and did conceal that the Company's business prospects were misrepresented.   In furtherance of this plan, conspiracy, and course of conduct, the defendants collectively and individually took the actions set forth herein.

59.     The defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.   During this time, the Defendants caused the Company to issue false and misleading statements regarding HP's financial prospects.

60.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) disguise the defendants' violations of law, including breaches of fiduciary duty; and (ii) disguise the Company's financial disclosures.

61.     The defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.   Because the actions described herein occurred under the authority of the Board, each of the HP Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

62.     Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commissions of the wrongdoings complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background of the Autonomy Acquisition

63.     Over the last several years, the traditional personal computer business has struggled, and as a large player in that space, HP has suffered in kind.   HP's stock price was trading for over $50 per share in 2010 and had a market capitalization of over $100 billion. Throughout 2011, the Company's share price was in decline, eventually trading down into the

low $30s by early August 2011.  HP was stuck in low growth businesses with thin margins, and the Company was desperate to expand into faster growing areas of the technology space to turn around its souring prospects and sluggish stock price.

64.    To contend with its industry growth issues and lagging stock price, HP announced, after the close of markets on August 18, 2011, that it was acquiring London-based Autonomy in a transaction valued at over $10 billion.  Autonomy specializes in database search and enterprise software technologies.  The Boards of both HP and Autonomy unanimously approved the transaction.  Based on Autonomy's closing stock price on August 17, 2011, the $42.11 per share consideration paid by HP represented a one day premium to Autonomy shareholders of approximately 64%.

## The Warning Signs of Autonomy's Overvaluation are Ignored by the HP Individual Defendants and the Advisor Defendants

65.    Numerous warning signs were apparent to or available to the HP Individual Defendants and the Advisor Defendants.  A few of these warning signs, which were consciously disregarded by the HP Individual Defendants and the Advisor Defendants, are listed below.

### HP Had a Long History of Overpaying for Acquisitions

66.    HP had a history of vastly overpaying for acquisitions of companies, resulting in massive write downs.  For this reason HP's executives and directors should have been particularly sensitive when making major acquisitions.

67.    For example, in 2002 HP acquired Compaq for $19 billion in its biggest acquisition to date.  HP was forced to write off $1.2 billion associated with that deal as the global personal computer market slowed in 2012.

68.    In 2008, HP purchased Electronic Data Systems ("EDS"), a technology consulting company, for $13.9 billion.  After EDS failed to perform up to HP's expectations, HP wrote off $8 billion associated with that transaction in July 2012.

69.    In 2010, HP acquired smartphone-maker Palm for $1.2 billion.  HP purchased Palm primarily for its webOS operating system, even though Palm was already being beaten by

the Android and iPhone.  In 2011, HP was forced to write down $885 million associated with that purchase.

***Comparable    Transaction    Analysis    Demonstrates    Autonomy's    "Obvious" Overvaluation***

70.     A simple comparison of the Autonomy acquisition to the deal metrics of other comparable transactions demonstrates that HP paid an egregiously high price for Autonomy.  A comparable transaction analysis is one of the most common methods used to value a company for sale and was undoubtedly performed by HP's financial advisors when advising HP on the Autonomy deal.  This analysis looks at similar or comparable transactions where the acquisition target  has  a  similar  business  model  and  similar  client  base  to  the  company  being evaluated.  According to Bloomberg, as the below chart depicts, HP paid deal ratios that were astronomically higher than the median ratios for comparable transactions.  For instance, HP paid 24 times Autonomy's EBITDA compared to the comparable transaction median of less than 17 times.  HP paid an unheard of 11 times sales (revenue) versus a median ratio of comparable transactions of less than 4 times.

| Target Name | Annc. Date | Annc. Value | EBITDA | Sales | Total Assets | Cash Flow from Ops. | Free Cash Flow |
|---|---|---|---|---|---|---|---|
| **Autonomy Corp PLC** | **08/18/11** | **6,253** | **23.9** | **11.1** | **2.98** | **35.0** | **152.2** |
| **Comp Deals Median** | | | **16.6** | **3.9** | **1.90** | **16.6** | **62.9** |
| Peoplesoft Inc | 06/06/03 | 8,402 | 23.5 | 4.4 | 2.91 | 26.0 | n/a |
| BEA Systems Inc | 10/12/07 | 6,779 | n/a | 4.7 | 3.03 | 32.7 | 134.5 |
| Sybase Inc | 05/12/10 | 5,323 | 13.1 | 4.5 | 2.18 | 13.8 | 56.5 |
| Business Objects SA | 10/07/07 | 5,248 | 19.8 | 3.4 | 1.54 | 19.5 | 199.6 |
| Hyperion Solutions Corp | 03/01/07 | 2,706 | 20.1 | 3.3 | 2.71 | 14.7 | 62.9 |
| Teranet Income Fund | 09/04/08 | 1,847 | 10.5 | 7.5 | 0.79 | 11.8 | 34.6 |
| Infor US Inc | 04/26/11 | 1,813 | 13.5 | 2.4 | 1.29 | 12.4 | 26.0 |
| SSA Global Technologies Inc | 05/15/06 | 1,551 | n/a | 2.1 | 1.61 | 18.5 | 87.1 |

71.     The Advisor Defendants and the HP Individual Defendants had access to this publicly available data and could have performed their own comparable valuations based on this information.   These Defendants failed to perform such routine violations or, alternatively, performed such valuations and ignored the results, resulting in a gross waste of HP's corporate assets in paying the highly inflated price for the Acquisition.

### *Autonomy is Publicly Criticized by Numerous Parties*

72.     For several years, industry experts had been raising red flags related to Autonomy's accounting practices and claims of continuous growth.   The HP Individual Defendants and the Advisor Defendants ignored these publicly available warnings, to the great detriment of the Company.

73.     For example, in 2007 CFRA, which performs forensic accounting for investor clients, added Autonomy to its "Biggest Concerns List."   CFRA noted that the company's reported cash flow and income "appear to have benefitted significantly" from questionable changes in the way it classified certain items.

74.     In August 2009, analyst Paul Morland of London brokerage Peel Hunt issued a warning about Autonomy's financial statements, calling them "wrong and misleading."   Morland followed up with additional reports stating that Autonomy's "track record over the last few years has been exaggerated," and that it "needs to make an acquisition every twelve to eighteen months in order to sustain its apparent high rate of growth."   In March 2011, Morland wrote that Autonomy's sales growth was slowing and "things are looking bad."

75.     In September 2010, analyst David Khan of J.P. Morgan called Autonomy's latest quarterly financial report "very disappointing."   He further wrote that Autonomy's "earnings momentum appears to be negative."

76.     Another prominent Autonomy skeptic was James Chanos of the hedge fund Kynikos Associates ("Kynikos").   Kynikos, a leading short seller, which profits by betting that companies' shares will fall, explained in a speech in 2010 that he bet against Autonomy that year because Autonomy's accounting was "absolutely dreadful, a disaster."

---

77.     Another analyst, Marc Geall ("Geall") of Deutsche Bank, who had previously worked at Autonomy, issued a detailed report criticizing Autonomy's management and business model.  At Autonomy, Geall was the head of a software division and later served as head of investor relations and corporate strategy.  Geall stated that Autonomy's "management structure, controls, and systems" were "more representative of a start-up than a major global player."  He also wrote that senior management lacked "bandwidth," and further noted, "This can lead to some decision paralysis as middle management is sometimes limited in its autonomy."

78.     Commenting on the $11.1 billion price HP paid for Autonomy, analyst Kevin Hunt of Auriga USA, LLC, stated that HP "is massively overpaying" for the Acquisition. Deutsche Bank analyst Chris Whitmore predicted that Autonomy would "destroy" the value of HP's stock.

79.     Larry Ellison, CEO of Oracle Corporation, was outspoken in his belief that Autonomy was overvalued.  During the time HP was acquiring Autonomy for over $11 billion, Ellison publicly stated that Autonomy was overvalued at $6 billion.  Ellison stated that Oracle had been approached by Lynch while Autonomy was being shopped and that Oracle had rejected these overtures based on its public analysis of Autonomy, maintaining that HP paid an "absurdly high" price for the Acquisition.  Additionally, Ellison also made a public spectacle of Lynch's penchant for dishonesty after Lynch denied that he had shopped Autonomy to Oracle.  Incensed at being called a liar by Lynch, Ellison issued a number of press statements refuting Lynch. Oracle eventually published on its website the PowerPoint slides that Lynch had presented to Ellison during the meeting, proving that Autonomy was being shopped to Oracle.  One of the slides indicated a value for Autonomy of only $5.7 billion as of January 24, 2011.  HP eventually agreed to pay nearly twice as much to acquire Autonomy.

80.     According to Michael Dell, the CEO of Dell, Inc., Dell had the opportunity to acquire Autonomy before HP did, but declined because the asking price was too expensive.  Dell stated in an interview that the decision to not purchase Autonomy was an easy one given the

amount of money Autonomy was seeking, specifically stating "that was an *overwhelmingly obvious conclusion* that *any reasonable person could draw*."

81.    Criticism of the Acquisition was not limited to Company outsiders. Defendant Lesjak's opposition to the Autonomy Acquisition was also ignored by the HP Individual Defendants, including the Board and the Advisor Defendants. A widely cited story published in *Fortune* in May 2012 quotes Lesjak as commenting on the Autonomy Acquisition to the directors, "I don't think it's a good idea. I don't think we're ready. I think it's too expensive. I'm putting a line down. This is not in the best interests of the company." Despite the CFO's opposition, the Board voted in favor of the Acquisition.

82.    Other HP insiders also noted their concern with the Acquisition. John Schultz ("Schultz"), HP's general counsel, stated in an interview that he was aware of rumors regarding accounting issues at Autonomy prior to the deal closing. He further stated that Autonomy kept opaque books and that "critical documents were missing from obvious places..."

### *Autonomy's Publicly Available Financial Statements Should Have Indicated to HP and/or the Advisor Defendants That the Acquisition was a Bad Deal*

83.    Though software companies tend to show high unearned income and low receivables on their profit/loss and balance sheets, at Autonomy it was the reverse. Companies that sell durable and tangible goods book high receivables (i.e. a debt a company is owed and expects to be paid) because their obligations are completed upon the sale of the item. On the other hand, software is usually sold for cash up front, while further payments tend to come from ongoing service and support. These ongoing payments cannot be reported as income because the payments have not yet been paid or the earnings process is incomplete, and since no intangible goods are involved, the risk of not being paid is greater. Accordingly, the expected future payments cannot be counted as assets, instead being accounted for as a liability. This is usually called "unearned income" or "deferred revenue."

84.    If the HP Individual Defendants and/or the Advisor Defendants had properly conducted due diligence, they would have seen glaring problems with Autonomy, which was

booking as income cash it had not yet received (resulting in high receivables) and not booking any obligation to provide future services for that income. In fact, Autonomy booked sales of $870 million, receivables of $330 million, and deferred revenue of $177 million. The HP Individual Defendants and the Advisor Defendants only needed to look at Autonomy's publicly filed balance sheet to recognize that the amount of receivables compared to total sales was far too high. The Audit Committee Defendants should have recognized this warning sign prior to approving HP's acquisition of Autonomy.

85. At the time HP agreed to acquire Autonomy, Autonomy's balance sheet listed only $80.2 million of tangible assets, though it listed $3.5 billion of total assets as of June 30, 2011. With this relatively low level of net tangible assets on Autonomy's balance sheet as of the second quarter of 2011, HP recorded $6.6 billion of goodwill, later revised upward to $6.9 billion. HP also recorded $4.6 billion of amortizable purchased intangible assets. The vast majority of the difference between the purchase price of Autonomy and the fair market value of Autonomy's net tangible assets is made up of the difference between the purchase price and the fair market value of Autonomy's net tangible assets. HP initially recorded the high valuations of goodwill and intangible assets (which are now being written down) because they realized Autonomy's identifiable assets were worth much less than HP paid.

86. Furthermore, Autonomy reported that its operating margins, which grew from 15% in 2005 and surpassed 50% by early 2010. This figure was unrealistically high, and the HP Individual Defendants and the Advisor Defendants knew or recklessly ignored this fact. The only major costs associated with creating software are research and development costs, and Autonomy could increase its margins by better amortizing these costs. The only way to accomplish this was to increase the number of customers to which Autonomy was selling its software, but Autonomy's reported margins were growing much faster than its relatively small customer base.

***Whistleblowers Come Forward Regarding Autonomy's Accounting Improprieties***

87.     In 2010, a U.S. executive for Autonomy pointed out problematic accounting practices to his superiors.   Among these problems, according to a November 26, 2012 *Wall Street Journal* article, was the way Autonomy booked revenue for products sold to resellers. After the executive was fired, he notified the SEC, U.K. regulators, and Autonomy's outside auditors of his concerns.   Because Autonomy was traded in the U.K., the SEC claimed that they did not have jurisdiction over Autonomy.   A spokesperson for Defendant Lynch stated that Autonomy's audit committee was made aware of the allegations and that Autonomy passed an independent review with independent auditors.   Lynch's spokesperson also stated that this information was revealed during HP's purported due diligence process.   The executive eventually reached a settlement which prohibited him from publicly discussing Autonomy.

88.     In May 2012, HP was approached by a whistle-blower regarding alleged accounting fraud at Autonomy prior to the Acquisition.   HP was thus prompted to conduct an internal investigation, which reportedly uncovered various accounting problems at Autonomy. HP's internal investigation uncovered, among other things, that Autonomy misclassified revenue, improperly mixing sales of software licenses with sales of hardware in an attempt to depict a more robust operational view of Autonomy, which made it appear that Autonomy's software business was doing better than it actually was.   These accounting improprieties misled HP as to Autonomy's profitability, especially regarding its gross margins, which are important in the technology sector because software generally has higher margins than hardware.   HP also discovered that Autonomy booked revenue prior to a proper sale taking place, violating prescribed accounting guidance.   HP further discovered that HP entered into "round-trip" transactions with clients, in which Autonomy agreed to buy a client's products or services while the client purchased Autonomy software.

89.     Autonomy's improper accounting had the effect of inflating its operating margins to the 40% to 45% level represented to HP, rather than the likely more accurate figure of 28% to 30%.   When these accounting proprieties were recognized, the value of Autonomy was severely

diminished.  HP was eventually forced to take an $8.8 billion write-down on Autonomy barely a year after the Acquisition, resulting in a catastrophic waste of HP's corporate assets.

**Deloitte's Failure to Discover Accounting Improprieties**

90.     By failing to discover Autonomy's accounting improprieties, Deloitte breached its duties.  Deloitte was contractually required to audit and review Autonomy's financial statements in accordance with professional attestation standards, including the International Standards on Accounting (UK and Ireland) ("ISA UK") (which address auditor's responsibilities relating to fraud in an audit of financial statements).  Deloitte expressly stated in its audit opinion of Autonomy, "Our responsibility is to audit and express an opinion on the financial statements in accordance with applicable law and International Standards on Auditing (UK and Ireland)."

91.     Deloitte failed to follow the required objectives under the ISA UK, including the following:

(a) To identify and assess the risks of material misstatement of the financial statements due to fraud;

(b) To obtain sufficient appropriate audit evidence regarding the assessed risks of material misstatement due to fraud, through designing and implementing appropriate responses; and

(c) To respond appropriately to fraud or suspected fraud identified during the audit.

92.     Fraud is characterized in ISA UK as follows:

Misstatements in the financial statements can arise from either fraud or error.  The distinguishing factor between fraud and error is whether the underlying action that results in the misstatement of the financial statements is intentional or unintentional.

Although fraud is a broad legal concept, for the purposes of the ISAs (UK and Ireland)*, the auditor is concerned with fraud that causes a material misstatement in the financial statements.  Two types of intentional misstatements are relevant to the auditor— misstatements resulting from fraudulent financial reporting and misstatements resulting from misappropriation of assets.*

93.     As the basis for Deloitte's opinions, it was required by ISA UK section 200 to obtain reasonable assurance regarding whether Autonomy's financial statements as a whole were

free from material misstatements, whether due to fraud or error. The high level of assurance contemplated by the term "reasonable assurance" is obtained when the auditor has obtained sufficient appropriate audit evidence to reduce audit risk (i.e. the risk that the auditor expresses an inappropriate opinion when the financial statements are materially misstated) to an acceptably low level.

94. Deloitte had a duty to perform its audits with professional skepticism, recognizing that circumstance may exist causing financial statements to be misstated. ISA UK section 200 states the following regarding professional skepticism:

**Professional Skepticism** (Ref: Para. 15)

A18. **Professional skepticism includes being alert to, for example:**

- *Audit evidence that contradicts other audit evidence obtained.*

- *Information that brings into question the reliability of documents and responses to inquiries to be used as audit evidence.*

- *Conditions that may indicate possible fraud.*

- Circumstances that suggest the need for audit procedures in addition to those required by the ISAs (UK and Ireland).

A19. Maintaining professional skepticism throughout the audit is necessary if the auditor is, for example, to reduce the risks of:

- Overlooking unusual circumstances.

- Over generalizing when drawing conclusions from audit observations.

- Using inappropriate assumptions in determining the nature, timing, and extent of the audit procedures and evaluating the results thereof.

A20. *Professional skepticism is necessary to the critical assessment of audit evidence. This includes questioning contradictory audit evidence and the reliability of documents and responses to inquiries and other information obtained from management and those charged with governance. It also includes consideration of the sufficiency and appropriateness of audit evidence obtained in the light of the circumstances, for example in the case*

*where fraud risk factors exist and a single document, of a nature that is susceptible to fraud, is the sole supporting evidence for a material financial statement amount.*

95.    Given the numerous warning signs alleged herein, it is apparent that Deloitte failed to apply requisite auditing procedures and practice professional skepticism.  Deloitte was at least negligent in failing to understand or ignoring the risks associated with Autonomy's accounting, including Autonomy's high receivables and low unearned income on its profit/loss and balance sheets, and the suspicious growth in Autonomy's reported operating margins.

96.    If Deloitte had properly investigated the matters discussed herein, it would have concluded: (i) a qualified audit opinion was required; and/or (ii) additional testing was necessary, which should have revealed Autonomy's accounting improprieties.

97.    By failing to properly evaluate Autonomy's internal controls over financial reporting, Deloitte breached its duties.  Deloitte's failures included: (i) assisting Lynch in deceiving HP as to the accounting improprieties which resulted in the overvaluing of Autonomy, and (ii) allowing the HP Individual Defendants to cause HP to issue improper financial statements.

98.    Moreover, because of the substantial amount of work that Deloitte performed for Autonomy, including a significant amount of non-audit work, Deloitte may have lacked independence in its auditing function.  Deloitte performed non-audit work for Autonomy which included legislative, tax, and corporate finance advice.  Of the $2.7 million in total fees Autonomy paid to Deloitte in 2010, $1.2 million was for non-audit work.

**The HP Individual Defendants' False and Misleading Statements**

99.    The HP Individual Defendants made a number of improper statements surrounding HP's acquisition of Autonomy.  The first occurred on August 18, 2011, when HP announced its intention to acquire Autonomy.  The press release stated in part:

"Autonomy presents an opportunity to accelerate our strategic vision to decisively and profitably lead a large and growing space," said Léo Apotheker, HP president and chief executive officer.  "Autonomy brings to HP higher value

business solutions that will help customers manage the explosion of information. Together with Autonomy, we plan to reinvent how both unstructured and structured data is processed, analyzed, optimized, automated and protected. Autonomy has an attractive business model, including a strong cloud based solution set, which is aligned with HP's efforts to improve our portfolio mix. We believe this bold action will squarely position HP in software and information to create the next-generation Information Platform, and thereby, create significant value for our shareholders."

Apotheker continued, *"Autonomy is a highly profitable and globally respected software company,* with a well-regarded management team and talented, dedicated employees. We look forward to partnering with a company who shares our commitment to solving customer problems by creating smart, cutting-edge products and solutions. I am particularly pleased that Dr. Mike Lynch, who heads a team of brilliant scientists and employees, will continue to lead Autonomy. I look forward to our collaboration as we focus on creating maximum value for the combined company, its customers and employees."

100.   On an August 18, 2011 earnings conference call following the announcement, Apotheker continued to promote the Acquisition to shareholders, stating in part:

…Let me start by actually making sure that everybody on the call understands what Autonomy represents for us.

Autonomy represents an opportunity for HP for us to accelerate our vision to decisively and profitably lead a large and growing space which is the Enterprise Information Management space. It also brings HP higher value business solutions that will help customers manage the explosion of information. *If we execute this deal, it will position HP as a leader in the large and growing space.* It will complement our existing technology of portfolio and enterprise strategy.

It will provide differentiated IP for Services and extensive vertical capability in key industries. It will provide IPG a base for content management platform. *It will, over time, significantly enhance HP's financial profile and the Board believes that the transaction is accretive to HP's non-GAAP earnings in its first full year after completion.*

*Autonomy as a business has a very profitable financial model with a very compelling value proposition and I have been able to bring solutions into 400 OEMs, which shows that they are basically a de facto industry standard. Autonomy has grown its revenues at a compound annual growth rate of approximately 55% and adjusted operating profit at the rate of approximately 83% over the last 5 years. We're buying a very strong business and we believe that we can extract a lot more out of this business by combining it with HP. And that was the justification for the price.*

*     *     *

Moreover, Autonomy's business is well-aligned to HP's effort to change and focus our business mix. *In 2010, Autonomy had gross margins in the high 80s and operating margins above 40%. They have demonstrated a strong consistent track record of double-digit revenue growth.*

101.    On a September 13, 2011 conference call, Apotheker discussed the "great return to shareholders" that Autonomy would provide, stating in part:

….I'm sure we have many more questions on Autonomy, but, just to position that squarely in everybody's minds, the idea around Autonomy is to really strengthen HP's capabilities tremendously in this whole notion of data. We talked about data in San Francisco. We will talk a lot about data, probably, today, as well, structured and unstructured. And, therefore, Autonomy is a very important asset.

*     *     *

And let me just try to build on that and help you understand how we came to the *valuation of Autonomy. We have a pretty rigorous process inside HP that we follow for all of our acquisitions, which is a DCF-based model, and we try to take a very conservative view at this.* Just to make sure everybody understands. Autonomy will be, on day one, accretive to HP. For FY 2012, Autonomy, once we integrate it, is accretive to HP.

Now, we have identified five synergy possibilities- five synergy leverages on how we can build up the Autonomy business and how we can synergize it between HP and Autonomy. And I can walk you through that, through these various elements. But just take it from us. *We did that analysis at great length, in great detail, and we feel that we paid a very fair price for Autonomy. And it will give a great return to our shareholders.*

102.    On the same conference call, an analyst asked Apotheker about the due diligence that HP undertook to "investigate any concerns around accounting" related to the Acquisition. Apotheker's answer conceded that the basis for the Board's due diligence was not HP conducting its own due diligence, but instead the work done by Autonomy's auditors, stating:

*We have and are running an extremely tight and very professional due diligence process.* I've got to tell you, I have challenges with the question itself. Autonomy is a publicly traded company in the UK. And *they are, therefore, audited like any other FTSE company, and they're being audited on very professional standards.*

1

*And, therefore, that's where we pick up the trail and do our due—that's the basis
of our due diligence.*

2

3      103.    On September 22, 2011, HP terminated Apotheker as CEO and announced that

4   Whitman would take over as President and CEO.    On a conference call regarding her

5   appointment, Whitman stated that she was "excited about" the Autonomy Acquisition.

6      104.    HP conducted its fourth quarter 2011 earnings conference call on November 21,

7   2011.  Whitman and Lesjak participated in the call.  During the call, Whitman stated:

8

9      [W]e closed the Autonomy acquisition on October 3.  In the last month, we've had
       hundreds of leads passed between the two companies, and we've created a new
10      information management business group that combines Autonomy, Vertica, and
       other HP software assets under Mike Lynch, and reports directly to me.

11
                                    *       *       *
12      Well let me just spend a moment on Autonomy.  I am really excited about this
       acquisition.  *As you all know, I think it really positions HP as a leader in the Next-*
13      *generation information management and analytics capabilities, as the explosion of*
       *data is making these capabilities absolutely critical.  Autonomy is a unique asset.*
14      It has a remarkable ability to manage unstructured information in a way that no one
       else in the market does.  I think that adds a lot of value not only in their space but
15      actually across HP.

16      So, what we've set up is Autonomy is actually running fairly autonomously
17      (laughter) but we have done a great job I think of integrating the go-to market.  So,
       there are sales leads that are going from Autonomy to HP—interestingly, which we
18      didn't expect so much of it in terms of a hardware pull-through-but also from our HP
19      sales team back to Autonomy.  We've got a clearing house that vets all those leads.
       So, that what we turn over to Autonomy are really high quality leads that will allow
20      Autonomy to grow much faster than they would have grown on their own.  That's
       the name of the game for 2012.

21
       There's going to be lots of other things we do together but accelerating the growth of
22      Autonomy using the distribution capability of HP is priority number one, two and
23      three for 2012.

24   During the call, Lesjak stated:

25      We closed the acquisition of Autonomy in October, and therefore, we had roughly
       one month of results in the software numbers.  *The integration is going well thus*
26      *far, and we are focused on enabling our global sales force to ramp on the*
       *Autonomy product line-up, so they can begin selling Autonomy software in fiscal*
27      *'12.*

28

105.   On December 14, 2011, HP filed a Form 10-K with the SEC for the fiscal year ending October 31, 2011, which was signed by defendants Whitman, Lesjak, Murrin, Andreesen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane Livermore, Reiner, Russo, Thompson, and Whitworth.   The 10-K contained misleading statements regarding the Company's acquired intangible assets and reported goodwill.   The 10-K booked Autonomy-specific goodwill  and acquired intangible assets in the amount of $11.1 billion, which was materially overstated since HP had overpaid for Autonomy and would be forced to write-down a majority of its good will and acquired intangible assets.

106.   On February 22, 2012, HP conducted its first quarter 2012 earnings conference call.   On the call, Whitman stated in part, "the Autonomy acquisition is going well."   Lesjak echoed this view, stating in part, "we are pleased with the Autonomy acquisition, the pipeline is strong and level of lead generation we are seeing across HP for Autonomy software and services is compelling."

107.   On March 12, 2012, HP filed a Form 10-Q with the SEC for the first quarter ended January 31, 2012, which was signed by defendants Whitman and Lesjak.   The 10-Q contained misleading statements regarding the Company's acquired intangible assets and reported goodwill.  The 10-Q booked Autonomy-specific goodwill and acquired intangible assets in the amount of over $10.9 billion, which was materially overstated since HP had overpaid for Autonomy and would be forced to write-down a majority of its good will and acquired intangible assets.

108.   Throughout May 2012, HP's stock price declined as news began to leak that Autonomy was performing poorly.

109.   On May 23, 2012, HP conducted its second quarter 2012 earnings conference call. Though it was acknowledged that Autonomy had a "very disappointing" revenue quarter, HP failed to disclose that a whistle-blower had come forward regarding accounting improprieties at Autonomy.  Whitman stated:

1

2        To help improve Autonomy's performance, Bill Veghte, HP's Chief Strategy
Officer and Executive Vice President of HP Software, will step in to lead

3        Autonomy. Mike Lynch, Autonomy's Founder and Executive Vice President for
Information Management will leave HP after a transition period. The market and

4        competitive position for Autonomy remains strong, particularly in cloud
offerings, and we have been flooded with a number of big deal leads. Bill is an

5        experienced software leader, *who will develop the right processes and discipline*

6        *to scale Autonomy and fulfill its promise, although it will take a few quarters*
*to see tangible improvement.*

7

8        110.    On June 8, 2012, HP filed a Form 10-Q with the SEC for the second quarter

9  ended April 30, 2012, which was signed by defendants Whitman and Lesjak. The 10-Q

10  contained misleading statements regarding the Company's acquired intangible assets and

11  reported goodwill. The 10-Q booked Autonomy-specific goodwill and acquired intangible assets

12  in the amount of over $10.8 billion, which was materially overstated since HP had overpaid for

13  Autonomy and would be forced to write-down a majority of its goodwill and acquired intangible

14  assets.

15        111.    HP issued a press release on August 8, 2012 announcing that it expected to record

16  an $8 billion goodwill impairment charge within its Enterprise Service segment due to "recent

17  trading values of HP's stock, coupled with market conditions and business trends within the

18  Services segment." HP failed to provide any information at this time regarding the collapse in

19  profitability and business prospects of the Enterprise Services business.

20        112.    HP confirmed in a Form 8-K filed with the SEC on August 22, 2012 that it was

21  taking an $8 billion goodwill impairment charge against third quarter 2012 earnings, associated

22  with the Enterprise Services segment.

23        113.    On that same day, HP conducted an earnings conference call. Whitman

24  participated in the call and acknowledged the continuing difficulties with Autonomy. She further

25  concealed important adverse information about Autonomy and HP's Enterprise Services

26  segment. Whitman stated in part:

27

28

Now, let me outline some areas where we're not where we need to be. While Enterprise Services performance in the third quarter was within our expectations, there's still a lot of work that needs to be done. Earlier this month we announced a change in leadership at ES with Mike Nefkens stepping in to lead on an acting basis. Mike is an experienced leader who has led IT transformations for a number of our largest accounts.

*     *     *

Autonomy still requires a great deal of attention and we've been aggressively working on that business. Among the many changes we've instituted is a global dashboard to track Autonomy's pipeline. A single global sales methodology, a single HP Services engagement process, and a global process to measure client satisfaction and service delivery progress. These actions are designed to help deliver predictable results and improve after-sale customer satisfaction.

During the call, Lesjak added:

Moving on to Services. As we announced on August 8, we are recording a GAAP only non-cash pretax charge of approximately $8 billion for the impairment of goodwill within the Services segment. The impairment stems from the recent trading values of HP stock coupled with market conditions and business trends within the Services segment. We do not expect this goodwill impairment charge to result in any future cash expenditures or otherwise affect the ongoing business or financial performance of the Services segment.

114.     On September 7, 2012, HP filed a Form 10-Q with the SEC for the third quarter ended July 31, 2012, which was signed by defendants Whitman and Lesjak. The 10-Q contained misleading statements regarding the Company's acquired intangible assets and reported goodwill. The 10-Q booked Autonomy-specific goodwill and acquired intangible assets in the amount of over $10.7 billion, which was materially overstated since HP had overpaid for Autonomy and would be forced to write-down a majority of its good will and acquired intangible assets.

115.     The defendants knew, but concealed from the investing public, the following true facts:

     a.  HP knew that Autonomy had major accounting problems as early as May 2012;

b.  The due diligence performed on the Autonomy acquisition by the HP Individual Defendants was inadequate, and as a result HP overpaid for Autonomy;

c.  HP's acquired intangible assets and reported goodwill were overstated, requiring substantial write-downs; and

d.  The Company's Enterprise Service division's operating margins were rapidly falling.

## The Truth Emerges

116.   At an October 3, 2012 Security Analyst Meeting, Michael Nefkens, HP's Acting Global Enterprise Services Leader, and Jean-Jacques Charhon, HP's Senior Vice President and Chief Operating Officer of Enterprise Services, gave a presentation which described the Enterprise Services rapid downward trajectory.  The presentation showed that by August 2011, the operating margin of the Enterprise Services' division had fallen from 10% to 5%, or $6 billion in quarterly revenues.  By October 2012, the presentation noted that the operating margin had fallen to 3%, and further noted that in 2013 the Enterprise Services segment's revenue would fall by 11% to 13% and that operating margins were expected to be in the range of 0% to 3%.

117.   The "first time" disclosure of the Enterprise Services division's falling profits stunned the market.  Topeka Capital Markets stated in an October 3, 2012 report:

> **Most Negative Impact to FY13 EPS to be Enterprise Services.**  Yesterday we talked about the services business being our biggest concern.  The biggest driver of YoY EPS decline in HP Enterprise Services, that is expected to negatively impact FY13 EPS by $0.29-$0.35 with sales falling 11%-13% YoY.  ***The operating margin of the Enterprise Services business is expected to be 0% to 3% in FY13 and  well below the 11% delivered in 3QFY12.  Keep in mind, HP had at one time expected operating margin to be 16% to 17.5% in this business.***  Given a recent CRN article indicating HP has been trying to sell its Enterprise Services business (and since denied by HP), we believe there was some truth to this article given HP's weak FY13 outlook for this business.  ***Since Enterprise Services was the biggest contributor of profit for HP last quarter . . . this is a long term concern.***

118.   An October 4, 2012 news article in the *Contra Costa Times* was similarly negative on HP's prospects for resolving the problems with the Enterprise Services division:

> Analysts expect the company's revenue and margins to falter, increasing uncertainty about its recent strategic decisions which focus on transforming the former industry powerhouse into an enterprise computing corporation that take on IBM and Dell.
>
> ***"HP's assumption of turning around the enterprise services business within one-two years looks aggressive, given the significant revenue decline and margin deterioration expected in fiscal 2013,"*** BMO Capital Markets analyst Keith Bachman said.

119.   HP's biggest shock to the market occurred on November 20, 2012, when the company announced that it was writing down goodwill and intangible assets related to Autonomy in the amount of $8.8 billion, roughly 80% of the cost of the Acquisition.  HP blamed the impairment charge on accounting improprieties at Autonomy that occurred prior to the Acquisition.  The press release stated in pertinent part:

> "HP is extremely disappointed to find that some former members of Autonomy's management team used accounting improprieties, misrepresentations and disclosure failures to inflate the underlying financial metrics of the company, prior to Autonomy's acquisition by HP. These efforts appear to have been a willful effort to mislead investors and potential buyers, and severely impacted HP management's ability to fairly value Autonomy at the time of the deal. We remain 100 percent committed to Autonomy and its industry-leading technology."

> Additional background:

> HP today announced a non-cash impairment charge of $8.8 billion related to Autonomy in the fourth quarter of its 2012 fiscal year. The majority of this impairment charge, more than $5 billion, is linked to serious accounting improprieties, misrepresentation and disclosure failures discovered by an internal investigation by HP and forensic review into Autonomy's accounting practices prior to its acquisition by HP.  The balance of the impairment charge is linked to the recent trading value of HP stock and headwinds against anticipated synergies and marketplace performance.

> HP launched its internal investigation into these issues after a senior member of Autonomy's leadership team came forward, following the departure of Autonomy founder Mike Lynch, alleging that there had been a series of questionable accounting

and business practices at Autonomy prior to the acquisition by HP. This individual provided numerous details about which HP previously had no knowledge or visibility.

HP initiated an intense internal investigation, including a forensic review by PricewaterhouseCoopers of Autonomy's historical financial results, under the oversight of John Schultz, executive vice president and general counsel, HP.

As a result of that investigation, HP now believes that Autonomy was substantially overvalued at the time of its acquisition due to the misstatement of Autonomy's financial performance, including its revenue, core growth rate and gross margins, and the misrepresentation of its business mix.

Although HP's investigation is ongoing, examples of the accounting improprieties and misrepresentations include:

- The mischaracterization of revenue from negative-margin, low-end hardware sales with little or no associated software content as "IDOL product," and the improper inclusion of such revenue as "license revenue" for purposes of the organic and IDOL growth calculations.
- This negative-margin, low-end hardware is estimated to have comprised 10-15% of Autonomy's revenue.
- The use of licensing transactions with value-added resellers to inappropriately accelerate revenue recognition, or worse, create revenue where no end-user customer existed at the time of sale.

This appears to have been a willful effort on behalf of certain former Autonomy employees to inflate the underlying financial metrics of the company in order to mislead investors and potential buyers. These misrepresentations and lack of disclosure severely impacted HP management's ability to fairly value Autonomy at the time of the deal.

## Fraudulent Repurchases

120.    Throughout this time, HP directors Apotheker, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and Whitman directed or permitted the Company to overpay for its own stock through a massive share repurchase plan. Less than a month before the announcement of the Acquisition, these defendants authorized an additional $10 billion to the Company's stock repurchase program, which still had $5.9 billion of repurchase authorization remaining. As demonstrated in the chart

below, between August 2011 and October 2012, the Board permitted the Company to repurchase over $2.1 billion of HP's artificially inflated stock:

**Hewlett-Packard Quarterly Share Repurchases**

| Fiscal Quarter<br>For the period ended: | 4q11<br>10/31/11 | 1q12<br>01/31/12 | 2q12<br>04/30/12 | 3q12<br>07/31/12 | 4q12<br>10/31/12 | Total |
|---|---|---|---|---|---|---|
| Cash (mm) | $500 | $780 | $350 | $365 | $124 | **$2,119** |
| Shares (mm) | 17.0 | 29.0 | 13.0 | 16.5 | 7.6 | **83.1** |
| avg. price | $29.41 | $26.90 | $26.92 | $22.12 | $16.32 | **$25.50** |

HPQ's closing stock price on November 20, 2012:     $11.71
Percentage decline on share repurchases during the reflected period:     *-54.1%*

| **Dollar-vale decline as a result of share repurchases (mm):** | **$1,146** |
|---|---|

121.    As noted herein, at the time the Company announced the repurchase authorization in July 2011, the Board had either already decided to, or was anticipating the decision to, acquire Autonomy for over $11 billion.  Not only should the Board have known that Autonomy was massively overvalued, but the Board also began conducting an investigation based on a whistle-blower's accusations of accounting fraud, eventually leading to the $8.8 billion write-down. Despite knowing that its forthcoming announcements related to the write-down would cause the Company's stock to tumble, Defendants Apotheker, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and Whitman allowed the Company to deplete its assets by paying to repurchase its own artificially inflated stock.

122.    Through the share repurchase program, HP repurchased over 83 million shares of its stock at an estimated average price of $25.50 for a total aggregate cost of over $2.1 billion. Notably the $25.50 weighted average price was over double HPS's share price of $11.71 after the release of the Autonomy write-down news.  As noted in the chart above, when comparing the repurchased shares at inflated prices to HP's $11.71 share price after the announcement of the Autonomy write-down, the Company incurred over $1 billion in losses as a result of the share repurchases.

**Insider Selling**

123.   While the share repurchase program was proceeding, Murrin was selling his HP stockholdings, as depicted in the chart below.  From August 2011 through February 2012, Murrin sold a total of 132,500 shares for $3,477,400.  These stock sales represented over two thirds of his holdings of HP stock.

| Date | Shares | Type | Transaction | Value |
|---|---|---|---|---|
| *Murrin, James — SVP / GM* | | | | |
| 08/22/11 | 30,000 | Direct | Sale at $24.61 per share. | $738,300 |
| 11/29/11 | 30,000 | Direct | Sale at $27.02 per share. | $810,600 |
| 01/30/12 | 30,000 | Direct | Automatic Sale at $27.28 per share. | $818,400 |
| 02/28/12 | 42,500 | Direct | Sale at $26.12 per share. | $1,110,100 |
| Total | 132,500 | | | $3,477,400 |

124.   Notably, Murrin's sales depicted in the chart above were unusually large for him. Prior to August 22, 2011, Murrin's largest sale was only 18,000 shares, and most of his sales were for less than 10,000 shares at a time.  During the Relevant Period, Murrin increased his sales to at least 30,000 per sale date.

125.   Murrin was the Principal Accounting Officer, Senior Vice President, and General Manager of the end-user workplace and managed network services business within HP's Enterprise Services division, and thus had access to material, non-public information about the true state of that division.  The insider trading activity described herein occurred at a time when he knew adverse, material, non-public information that would directly affect HP's bottom line.

## DAMAGES TO HP

126.   The actions of the HP Individual Defendants in causing the Company to materially overpay for Autonomy have irreparably damaged HP's corporate image, intangible assets, and goodwill.  HP has expended and will continue to expend substantial sums of money as a direct and proximate result of the HP Individual Defendants' action.  In addition to the 61% loss in market cap ($36 billion), HP must also spend significant sums on:

      a.   Costs incurred from overpaying for Autonomy;

b. Costs incurred from the internal investigation into the alleged accounting fraud of Autonomy;

c. Costs incurred from repurchasing its stock at artificially inflated prices;

d. Costs incurred related to a pending securities fraud lawsuit;

e. Costs incurred from compensation paid to the defendants who have breached their duties to the Company.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

127.   Plaintiff brings this action derivatively for the benefit of HP to redress defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by defendant Lynch, the HP Individual Defendants, Deloitte, and the Advisor Defendants. HP is named as a nominal defendant solely in a derivative capacity.

128.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

129.   Plaintiff is a current owner of HP common stock and was an owner of HP common stock during the Relevant Period in which the Individual Defendants' wrongful course of conduct alleged herein occurred.

130.   The current Board of HP consists of the following individuals: Andreesen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitman, and Whitworth. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be futile.

**Defendants' Conduct is Not a Valid Exercise of Business Judgment**

131.   The decision to approve the Acquisition despite the numerous warning signs without conducting adequate due diligence ensures that Defendants Thompson, Gupta, Banerji, Reiner, Hammergren, Andreessen, Lane, Russo, and Livermore are not protected from the business judgment rule.   Defendant Deloitte's and the Advisor Defendants' review and recommendations do not absolve these defendants from liability. Defendants Thompson, Gupta, Banerji, Reiner, Hammergren, Andreessen, Lane, Russo, and Livermore had an independent duty

to consider all reasonably available information before entering into the Acquisition, especially in light of the numerous warning signs as to Autonomy's overvaluation. Therefore, demand is futile and is excused.

132.    The decision to direct or permit the Company to overpay for its own stock through the stock repurchase described herein renders the business judgment rule inapplicable to defendants Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, and Whitman. At the same time that these defendants were causing HP to issue improper statements concerning Autonomy's goodwill and intangible assets and the purported benefits of the Acquisition, these Defendants allowed the Company to repurchase over $2.1 billion of the Company's artificially inflated stock between August 2011 and October 2012. At a minimum, these defendants were grossly negligent in authorizing these repurchases while they knew or consciously disregarded the fact that the Company's stock was artificially inflated. Since at least May 2012, the Board knew of the accounting fraud at Autonomy when a whistle-blower came forward with this information, resulting in a six-month internal investigation and the $8.8 billion write-down related to Autonomy. Despite being aware that these forthcoming announcements would cause the Company's stock to fall, these defendants caused HP to repurchase over twenty-three million artificially inflated shares after May 2012. This reckless disregard for the Company's assets is a breach of the Board's duty of care. Accordingly, the business judgment rule does not protect the Board's decision to authorize the repurchases. Therefore, demand is futile and is excused.

**Defendants Face a Substantial likelihood of Liability for Their Misconduct**

133.    Defendant Whitman, as CEO of HP, was ultimately responsible for the Company's operations, financial statements, and internal controls, and thus faces a substantial likelihood of liability for her violation of section 10(b) of the Exchange Act, as alleged above. In violation of her fiduciary duties, Whitman knowingly or extremely recklessly made the improper statements regarding the Company's financial results and business prospects, as alleged herein.

1    Accordingly, because she faces a substantial likelihood of liability for violations of federal

2    securities law, demand upon Whitman is futile.

3            134.    Defendants Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner,

4    Russo, Thompson, and Whitworth face a substantial likelihood of liability for violation of

5    section 20(a) of the Exchange Act.  These defendants had the power and ability to control and

6    prevent the dissemination of the foregoing false and misleading statements to be disseminated

7    into the market, which had the effect of artificially inflating the value of the Company's stock.

8    These defendants' failure to exercise proper control over the Company's public disclosures

9    further led the Company to repurchase over $2.1 billion of its own stock at inflated prices, which

10    it would not have done had the true value of the Company's stock been known.  Accordingly,

11    these defendants face a substantial likelihood of liability for violation of federal securities laws,

12    rendering any demand upon them futile.

13            135.    Defendants Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner,

14    Russo, Thompson, and Whitman face a substantial likelihood of liability for wasting billions of

15    dollars of the Company's assets for authorizing and failing to halt HP's $2.1 billion repurchase

16    of its own stock.  At the same time that these defendants authorized the repurchase, they knew of

17    the non-public inside information concerning Autonomy's accounting improprieties and the

18    inevitable impairment to Autonomy's goodwill and intangible assets.   Knowing this, no

19    reasonable person would have paid the price these defendants caused the Company to pay for HP

20    stock.  Accordingly, these defendants are liable for the amount that the Company wasted and

21    therefore, demand on these defendants is futile.

22            136.    Additionally, defendants Andreessen, Banerji, Gupta, Hammergren, Lane,

23    Livermore, Reiner, Russo, Thompson, and Whitman face a substantial likelihood of liability for

24    wasting billions of dollars of the Company's assets in the Autonomy acquisition.  As alleged

25    herein, these defendants knew or consciously disregarded numerous warning signs regarding

26    Autonomy's potential accounting improprieties and its overvaluation. Despite the warning signs,

27    these defendants approved the acquisition of Autonomy without conducting proper due

28

diligence. Accordingly, these defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, these defendants face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

137. Defendants Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitman and Whitworth also face a substantial likelihood of liability for making and allowing the other HP Individual Defendants to make improper statements about HP's financial condition. Each of these defendants knew, or in reckless disregard of their fiduciary duties failed to know, the truth about Autonomy's accounting improprieties and the ensuing impairment to the Company's goodwill and intangible assets. Nevertheless, these defendants either participated in or allowed the improper statements to continue.

138. Defendants Banerji, Gupta, Reiner, and Thompson served on the Audit Committee at all relevant times with respect to the wrongdoing alleged herein. The Audit Committee's Charter provides that it is responsible for "overseeing . . . HP's financial reporting process and the audit of HP's financial statements, including the integrity of HP's financial statements . . . " These defendants owed specific duties to HP to assist the Board in monitoring "risk assessment and risk management" and "review[ing] the adequacy and effectiveness of HP's internal controls, including any significant deficiencies in such controls and significant changes or material weaknesses in such controls . . . " Thus, these defendants were responsible for overseeing and directly participating in the dissemination of HP's improper financial statements. These defendants approved the dissemination of the improper statements related to the purported benefits to be achieved through the acquisition of Autonomy, despite their knowledge of the inadequate due diligence as discussed herein. These defendants reviewed and approved the dissemination of the improper statements, which failed to detect Autonomy's accounting improprieties and its resulting overvalued goodwill and intangible assets. Defendants Banerji, Gupta, Reiner, and Thompson as members of the Audit Committee, and defendants Banerji and Thompson in particular as "audit committee financial expert[s]," should have been familiar with

the relevant accounting rules concerning goodwill and intangible assets write-downs and the risks that HP faced from not accurately reporting these values.  Accordingly, defendants Banerji, Gupta, Reiner, and Thompson breached their fiduciary duty of loyalty by participating in the preparation of financial statements that contained improper information.  Thus, these defendants face a substantial likelihood of liability for their breach of fiduciary duties, so any demand upon them is futile.

139.    During the wrongdoing alleged herein, Defendants Banerji, Hammergren, Livermore, Reiner, Thompson, and Whitworth served on the Finance and Investment Committee.  As members of this Committee, these defendants owed specific duties "[t]o provide oversight of the finance and investment functions of HP."  Additionally, pursuant to HP's merger and acquisition approval policies, these defendants were required to assist "the Board in evaluating investment, acquisition, enterprise services, joint venture and divestiture transactions in which HP engages as part of its business strategy from time to time."  Despite these heightened duties under the Finance and Investment Committee Charter, these defendants caused HP to overpay for Autonomy.  In doing so, these defendants consciously disregarded the numerous warning signs described herein, alerting them to Autonomy's potential accounting improprieties and its overvaluation.  Thus, these defendants face a substantial likelihood of liability for their breach of fiduciary duties, so any demand upon them is futile.

140.    The acts complained of herein constitute violations of the fiduciary duties owed by HP's officers and directors and are incapable of ratification.

141.    Due to the wrongdoing complained of herein, HP has been and will continue to be exposed to significant losses.  The HP Individual Defendants and the current Board have not filed any lawsuits against themselves or others responsible for the wrongful conduct to attempt to recover for HP any part of the damages HP suffered and will suffer thereby, despite the HP Individual Defendants having knowledge of the claims and causes of action raised by plaintiff. In the face of the massive amount of media attention this matter has garnered, the Board's failure to investigate, correct, and commence legal action against those responsible for the misconduct

1   alleged herein demonstrates that the Board is incapable of independently addressing any

2   legitimate demand.

3       142.    Plaintiff has not made a demand on any of the other shareholders of HP to

4   institute this action since such demand would be a futile act for at least the following reasons:

5           (a)    HP is a publicly held company with 1.9 billion shares outstanding and

6   thousands of shareholders;

7           (b)    with no way of finding out the names, addresses, or phone numbers of

8   shareholders, making demand on this scale would be impossible for plaintiff; and

9           (c)    even assuming all shareholders could be individually identified, making

10  demand on all shareholders would force plaintiff to incur excessive expenses.

## COUNT I

### Against the HP Individual Defendants for Breach of Fiduciary Duty

13      143.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if

14  set forth fully herein.

15      144.    As alleged above, the HP Individual Defendants by reason of their positions as

16  officers and directors of HP and because of their ability to control the business and corporate

17  affairs of HP, owed the Company fiduciary obligations of good faith, fair dealing, loyalty, due

18  care, reasonable inquiry, oversight and supervision.

19      145.    As described in the allegations above, the HP Individual Defendants violated their

20  fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and

21  supervision.

22      146.    The HP Individual Defendants each knowingly, recklessly or negligently signed

23  or approved the issuance of false and misleading statements that misrepresented the Company's

24  business and financial prospects.  These actions could not have been a good faith exercise of

25  prudent business judgment to protect and promote the Company's corporate interests.

26      147.    By reason of the foregoing, HP has sustained significant damages.

27      148.    Plaintiffs, on behalf of HP, have no adequate remedy at law.

28

**COUNT II**

**Against HP Individual Defendants for Waste of Corporate Assets**

149.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

150.    Defendants Apotheker, Thompson, Gupta, Banerji, Reiner, Hammergren, Andreessen, Lane, Russo, Livermore, Robison, Babbio, Baldauf and Senequier breached their fiduciary duties and wasted HP's corporate assets by failing to conduct proper due diligence and causing the Company to substantially overpay for Autonomy.

151.    The HP Individual Defendants also wasted corporate assets by paying improper compensation and bonuses to certain of the Company's executive officers and directors who were in breach of their fiduciary duty.

152.    In addition, the Company has incurred significant potential liability for legal costs, penalties, fines, and/or legal fees in connection with the defense of the HP Individual Defendants' unlawful course of conduct complained of herein.

153.    As a result of the misconduct alleged herein, the HP Individual Defendants are liable to the Company.

154.    By reason of the foregoing, HP was damaged.

155.    Plaintiff, on behalf of HP, has no adequate remedy at law.

**COUNT III**

**Against the HP Individual Defendants for Unjust Enrichment**

156.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

157.    Through the wrongful course of conduct and actions complained of herein, the HP Individual Defendants were unjustly enriched at the expense of, and to the detriment of, HP. The wrongful conduct was continuous and resulted in ongoing harm to the Company. The HP Individual Defendants were unjustly enriched pursuant to receiving compensation and/or director remuneration while breaching their fiduciary duties to the Company, as well as the selling shares

of the Company by Defendant Murrin while in possession of material adverse information regarding the Company, as alleged herein.

158. Plaintiff, as a shareholder of HP, seeks restitution from the HP Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the HP Individual Defendants, from their wrongful course of conduct and fiduciary breaches.

159. By reason of the foregoing, HP was damaged.

160. Plaintiff, on behalf of HP, has not adequate remedy at law.

## COUNT IV

**Against Defendants Apotheker, Whitman, Murrin, and Lesjak for Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder**

161. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

162. Defendants Apotheker, Whitman, Murrin, and Lesjak knowingly or with extreme recklessness made and caused the publication of misleading statements regarding the financial health of the Company and its business prospects in connection with its acquisition of Autonomy and its Enterprise Services segment.

163. Defendants Apotheker, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Adreessen, Banerji, Reiner, Russo, Senequier, and Whitman caused HP to repurchase 83,752,070 shares of its own stock at artificially inflated prices (due to the false and misleading statements) at a cost to the Company of over $2.1 billion.

164. The wrongful conduct alleged herein was continuous, connected, and on-going. These defendants' misconduct resulted in continuous, connected, and on-going harm to the Company.

165. Defendants Apotheker, Whitman, Murrin, and Lesjak violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon HP stock.

166.    By repurchasing the Company's stock at prices these defendants knew were artificially inflated as a result of false and misleading statements, HP has suffered damages. But for these defendants' misconduct, the Company would not have purchased its stock at the prices it paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by the misleading statements.

## COUNT V

**Against the Director Defendants for Violation of Section 20(a) of the Exchange Act**

167.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

168.    The wrongful conduct alleged herein was continuous, connected, and on-going. Defendants Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Adreessen, Banerji, Reiner, Russo, Senequier, and Whitworth's misconduct resulted in continuous, connected, and on-going harm to the Company.

169.    Defendants Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Adreessen, Banerji, Reiner, Russo, Senequier, and Whitworth had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements disseminated by HP and the timing and amount of stock repurchases, and had the power and/or ability directly or indirectly to control or influence one another, and defendants Apotheker, Whitman, Murrin, and Lesjak in connection with the specific conduct that violated section 10(b) of the Exchange Act and SEC rule 10b-5 promulgated thereunder as alleged above.

170.   Each of these defendants is jointly and severally liable under section 20(a) of the Exchange Act to the same extent as defendants Apotheker, Whitman, and Lesjak for the primary violations of section 10(b) and rule 10b-5 promulgated thereunder, as set forth herein. Defendants Whitman, Lesjak, Murrin, Apotheker, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Adreessen, Banerji, Reiner, Russo, Senequier, and Whitworth did not act in good faith.

## COUNT VI

### Against Defendant Deloitte for Aiding and Abetting Breaches of Fiduciary Duty

171.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

172.   Defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and Whitman owe and owed to HP certain fiduciary duties as fully set out herein.

173.   Defendant Deloitte aided and abetted defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and Whitman in breaching their fiduciary duties owed to the Company.

174.   By committing the acts alleged herein, defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and Whitman breached their fiduciary duties owed to HP.

175.   Defendant Deloitte participated in the breaches of the fiduciary duties by the HP Individual Defendants for the purpose of advancing their own interests.   Defendant Deloitte obtained pecuniary benefits from the sale of Autonomy to HP while colluding in or aiding and abetting the HP Individual Defendants' breaches.

176.   Plaintiff, on behalf of HP, has no adequate remedy at law.

**COUNT VII**

**Against Defendant Deloitte for Aiding and Abetting Breaches of Fiduciary Duty**

177.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

178.   Defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and Whitman owe and owed certain fiduciary duties as fully set out herein.

179.   Defendant Deloitte aided and abetted defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and Whitman in breaching their fiduciary duties owed to the Company.

180.   By committing the acts alleged herein, defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and Whitman breached their fiduciary duties owed to HP.

181.   Defendant Deloitte participated in the breaches of the fiduciary duties by the HP Individual Defendants for the purpose of advancing their own interests. Defendant Deloitte obtained pecuniary benefits from the sale of Autonomy to HP while colluding in or aiding and abetting the HP Individual Defendants' breaches.

182.   Plaintiff, on behalf of HP, has no adequate remedy at law.

**COUNT VIII**

**Against Advisor Defendants for Aiding and Abetting Breaches of Fiduciary Duty**

183.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184.   Defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and Whitman owe and owed to HP certain fiduciary duties as fully set out herein.

185.    The Advisor Defendants aided and abetted defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and Whitman in breaching their fiduciary duties owed to the Company.

186.    By committing the acts alleged herein, defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and Whitman breached their fiduciary duties owed to HP.

187.    The Advisor Defendants participated in the breaches of the fiduciary duties by the HP Individual Defendants for the purpose of advancing their own interests.   The Advisor Defendants obtained monetary benefits from the sale of Autonomy to HP while colluding in or aiding and abetting the HP Individual Defendants' breaches.

188.    Plaintiff, on behalf of HP, has no adequate remedy at law.

**COUNT IX**

**Against Defendant Lynch for Aiding and Abetting Breaches of Fiduciary Duty**

189.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

190.    Defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and Whitman owe and owed to HP certain fiduciary duties as fully set out herein.

191.    Defendant Lynch aided and abetted defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and Whitman in breaching their fiduciary duties owed to the Company.

192.    By committing the acts alleged herein, defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo,

Thompson, Whitworth, Robison, Senequier, and Whitman breached their fiduciary duties owed to HP.

193.    Defendant Lynch participated in the breaches of the fiduciary duties by the HP Individual Defendants for the purpose of advancing his own interests.    Defendant Lynch obtained pecuniary benefits from the sale of Autonomy to HP while colluding in or aiding and abetting the HP Individual Defendants' breaches.

194.    Plaintiff, on behalf of HP, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all the defendants for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, violations of the Exchange Act, waste of corporate assets, unjust enrichment, negligence, and aiding and abetting thereof;

B.    Directing HP to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect HP and its shareholders from a repeat of the damaging events described herein, including but not limited to putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance policies:

i.    A proposal to strengthen the Board's supervision of the Company's CEO and CFO;

ii.    A proposal to strengthen the Company's policies prohibiting the misuse of proprietary non-public corporate information including the prohibition of trading shares of the Company's stock while in possession of such information;

iii.    A provision to permit the shareholders of HP to nominate at least two candidates for election to the Board;

iv.   A proposal to ensure the accuracy of the qualifications of HP's directors, executives, and other employees;

v.   A proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

vi.   A provision to appropriately test and then strengthen the internal audit and control functions;

vii.   A proposal to strengthen and make effective the Company's due diligence in any future or pending acquisitions.

C.   Awarding HP restitution from defendants and ordering disgorgement of all profits, benefits and other compensation obtained by defendants, including the gains from Murrin's insider selling;

D.   Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets to ensure that plaintiff, on behalf of HP, has an effective remedy;

E.   Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.   Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

DATED: December 18, 2012

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS
KEVIN S. KIM

SHANE P. SANDERS

600 B Street, Suite 1900
San Diego, CA 92101

Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsumeda.com
farroyo@robbinsumeda.com
ssanders@robbinsumeda.com
kkim@robbinsumeda.com

SAXENA WHITE P.A.
JOSEPH E. WHITE, III
LESTER R. HOOKER (241590)
ADAM WARDEN
2424 North Federal Highway
Suite 257
Boca Raton, FL 33431
Telephone: (561) 394-3399
Facsimile: (561) 394-3382

jwhite@saxenawhite.com
lhooker@saxenawhite.com
awarden@saxenawhite.com

Attorneys for Plaintiff

824748

## VERIFICATION

I, James D. Love, Assistant City Attorney for the City of Birmingham Retirement and Relief System, verify on behalf of the City of Birmingham Retirement and Relief System, that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to the City of Birmingham Retirement and Relief System and its own actions are true and correct and that the other allegations upon information and belief are true and correct.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: _December 14th_, 2012

_James D. Love_

(Signature of James D. Love, Assistant City Attorney for the City of Birmingham Retirement and Relief System)